Mason Smith & Company vs. Bierce et al.

---

## No. 13,235.

## MASON SMITH & COMPANY vs. W. W. BIERCE ET AL.

### SYLLABUS.

Certain parties in New Orleans proposed the erection of a cotton compress in Shreveport.

There entered into their plan the making of such arrangements with the local cotton men as would secure for the press the control of the greater part of the cotton received at Shreveport.

At the same time they proposed and agreed among themselves that the controlling interest in the corporation should always remain with themselves, and to this end that no one of the promoters should sell his share of stock to an outsider without first offering it to his associates.

But it was found that the local men who controlled the cotton· trade at Shreveport would have nothing to do with the enterprise unless the control of a majority of the stock was placed in their hands.

It being reported to plaintiffs that difficulties threatening to defeat the scheme existed, they wired their associates at Shreveport, who had gone there to carry their common plans into execution, that they would ratify and join in whatever it was thought best to do.

Their associates (defendants herein) then gave the Shreveport people an option on a number of shares sufficient to enable the latter to control the corporation, which was then organized and the compress erected. It proved a success, paying large dividends and its stock advanced within twelve months one hundred per cent. in value.

In this suit by plaintiffs to recover damages of defendants on account of the transfer of stock called for by the option without first offering same to plaintiffs:

HELD —That what defendants did was essential to the success of the enterprise and must be considered as coming within the intent, letter and spirit of plaintiffs' telegram and defendants are not answerable in damages.

A PPEAL from the Civil District Court, Parish of Orleans— *Ellis, J.*

---

*Branch K. Miller* for Plaintiffs, Appellants.

---

*Fenner, Henderson & Fenner* for Defendants, Appellees.

The opinion of the court was delivered by

BLANCHARD, J.    Plaintiffs are a commercial partnership carrying on the business of buying and selling cotton in New Orleans, with connections at Shreveport, Louisiana.

Defendants are promoters and builders of cotton compresses.

They proposed to plaintiffs to go in together and organize a corporation at Sheveport for the purpose of building, establishing and operating a compress there.

Plaintiffs, thinking well of the proposition, suggested the advisability of taking into the enterprise the commercial partnership of C. H. Minge & Co., who were likewise buyers and sellers of cotton at New Orleans and Shreveport.    This was assented to by defendants and Minge was brought in.

The three of them, Smith, Bierce and Minge, representing their respective firms, then laid their plans for the consummation of the object they had in view.

Columbus Bierce, one of defendants, was sent to Shreveport to initiate the movement for the construction of the press.

To ensure its successful operation after construction, it was necessary to interest in the project the commission merchants, factors and buyers at Shreveport who controlled the cotton trade of that city.

Smith, Bierce and Minge had started out with the idea and understanding that the control of the corporation should always remain in their hands, and to this end that the holdings of stock of the three should always constitute a majority of the shares.

To carry this out plaintiffs insist it was agreed and stipulated between the three that they, acting separately, should subscribe for enough of the stock which, in the aggregate of their holdings, would amount to a majority of the shares, and thus, by acting together, the control of the press would be retained in their hands.    Furthermore, that to secure the permanency of this control, it was agreed and stipulated between the three that no one of them could or should dispose of his holdings of stock to any other person or persons without first offering the same to his associates and giving them the opportunity to buy.

Defendants deny this, contending that the extent of the obligation they assumed to plaintiffs, as an inducement for the latter to go into the enterprise with them, was that they (defendants) would agree to insure plaintiffs against loss.

The agreement of these gentlemen among themselves that they (the three) should control a majority of the stock was easy to make, but in practice it was found it would not work.

The shrewd business men of Shreveport who controlled the cotton output of that city, and whose participation was absolutely essential to the success of the compress, had no idea of permitting the New Orleans parties to dominate the affairs of the corporation. It was alike their interest and intention that the control should be at the Shreveport end of the line, and they announced to Columbus Bierce, the agent of the New Orleans parties, their purpose to have nothing to do with his scheme unless it was so arranged that a majority of the stock should be held in Shreveport. They stipulated that the local cotton men, who were in a position to aid the enterprise by sending cotton to the press, should be permitted to take stock, and that in addition to the number of shares so taken three of the largest cotton dealers, Hicks, Ardis and Taylor, should be given an option on 150 shares of the stock at par—the option to last twelve months. The stock covered by the option, added to that subscribed by the local dealers in cotton, constituted a majority of the shares.

These requirements of the Shreveport parties had to be met, or else there would be a failure of the enterprise which Smith, Bierce and Minge were promoting.

Several other projects were, at the time, afoot looking to the construction of other compresses at Shreveport, or the enlargement of those already there, and the promoters of these were, too, soliciting the co-operation of Hicks, Ardis, Taylor and other local cotton interests and offering large inducements, and unless prompt action was taken by the representative of Smith, Bierce and Minge it was likely a deal would be made with some one of the rival concerns by which the support of the local interests would be lost to the former.

In this emergency Columbus Bierce urged upon his principals in New Orleans to come to Shreveport and assist him in the matter he had in hand. W. W. Bierce and Smith agreed to come and they were to meet at the train on an evening specified and go together to Shreveport. When W. W. Bierce reached the train Smith did not appear and Bierce went alone. On reaching Shreveport he found a telegram from Smith saying: "Could not get off last night, but will ratify and join in all you do."

Minge was already in Shreveport.

The same day Smith's telegram was sent a conference was held at Shreveport between the two Bierces, Minge, Hicks, Ardis and Taylor and one or two other local cotton dealers.

At this conference the project of organization was discussed and certain general understandings were reached. W. W. Bierce returned to New Orleans, leaving Columbus Bierce at Shreveport to continue negotiations and bring the enterprise to a successful issue.

To do this he found it necessary to agree to all the demands of the Shreveport people, among others the option on the 150 shares of stock. This option, in writing, was given some several days following the holding of the conference, at which W. W. Bierce was present. It was executed by Columbus Bierce for and on behalf of the firm of W. W. Bierce only, and, if called, was to affect their stock only.

By these means the support of the local cotton interests at Shreveport was secured, and a few days after the option was given the Columbia Compress and Warehouse Company was incorporated, officered entirely by Shreveport people, except that Smith, W. W. Bierce and Minge became members of the board of directors.

A site for the enterprise was secured, the buildings were erected and a compress, bought from Bierce, was put up. Everything was gotten in readiness for the approaching cotton season.

It seems that when Columbus Bierce, for the firm of W. W. Bierce, of which he was a member, gave the option on the 150 shares of stock, he did not apprise either Smith or Minge of the same.

This option was sure to be called if the compress proved a success by showing itself a money maker; it was equally certain not to be called if the reverse.

In November following, some seven months after the option was given, the success of the enterprise being assured, it was called. The Bierces were then in Chicago.

W. W. Bierce immediately wired plaintiffs at New Orleans as follows:

"Shreveport people have called option they held for our stock, given them at time of negotiation for press. Referring to our understanding that would not sell without consulting you, desire to say we are compelled to accept, but to do the correct thing by a friend as nearly as we know how, will take your stock if you care to dispose of it at a

dollar five. Desire to add that advices from there indicate it's a money maker. Act exactly as your judgment dictates."

To this plaintiffs replied:

"Never heard of option.. Do not understand matter. Could not sell at five hundred and leave Minge."

Following their above telegram to plaintiffs and confirmatory of the same, the Bierces wrote plaintiffs a lengthy letter from Chicago, and then left, both of them, for Shreveport. In this letter they explained fully the reasons why the giving of the option, which had been called, had been necessary in the process of negotiations with the Shreveport parties, and that without it the enterprise, now an assured money maker, would have fallen through. They stated they would be in Shreveport on a day named and requested plaintiffs to give them there, by telegraph, a frank expression relative to the matter.

Plaintiffs did not respond to this request and sent no telegram.

The Bierces found Minge at Shreveport. The latter had been apprised by plaintiffs of the condition of affairs. They asked him whether he had any objections to their transferring their stock to Hicks, Ardis and Taylor. They both testify he replied he had no objections, that Hicks, Ardis and Taylor were men of high character, and that the affairs of the company were safe in their hands. Mr. Minge in his testimony relative to this conversation, does not admit he went as far as saying he had no objection to the transfer of stock. His version is he replied: "I can't say it would hurt my stock, but that is all I will say at this time."

Following this talk with Minge, and on the same day, Bierce met the call of the option by transferring the stock to Hicks, Ardis and Taylor.                                                    ,

In the foregoing statement of the case many facts and circumstances related in the testimony and discussed in argument are omitted. The evidence is very voluminous. We have confined ourselves in the recital of facts to those only which are deemed necessary to make clear the view we take of the case.

After transferring the 150 shares to Hicks, Ardis and Taylor under their option, defendants disposed of, to the same parties, the remnant of stock they held—some 32 1-2 shares—at one hundred and twenty-five.

Previously they had disposed of 20 shares to a Mr. Bath, who, as a

Mason Smith & Company vs. Bierce et al.

cotton buyer at Shreveport, was a feeder of the compress and as such demanded to be allowed to subscribe to stock. Under the agreement made while negotiations were pending for the organization of the company this demand had to be met and Bierce met it out of his own stock.

According to plaintiffs' view the suit is one to recover damages for the violation of an agreement to sell stock. The contention is that defendants bound themselves if they should ever, for any reason, propose to sell their stock, they would first offer it to plaintiffs and to Minge, and only upon the refusal of these to buy would defendants have the right to sell to any one else; that the stock sold was not offered to plaintiffs and Minge, but was sold to other parties without first giving the former the opportunity to buy; that the stock was worth two hundred dollars per share at the time it was sold by defendant at par to Hicks, Ardis and Taylor; and that plaintiffs are entitled to recover, as the amount of loss they have sustained by defendants' breach of the contract, the difference between the par value of the stock and its real value at the time of the sale, together with the dividends the stock has earned.

According to defendants' view the suit is, rather, one for damages alleged to have been caused by the failure of Smith and his original associates to retain the control of the corporation, and the contention is that to recover plaintiffs must show they have been damaged. It is insisted that this is not and cannot be shown. On the contrary, that the case discloses an utter absence of either *injuria* or *damnum*, and that *"damnum absque injuria"* and *"injuria sine damnum"* are not actionable.

The learned judge below reached the conclusion that plaintiffs had failed to make out a case and from an adverse judgment the latter appeal.

Our opinion is that whatever agreements were entered into between Smith and Bierce at the inception of the enterprise the same had reference to a corporation *then* in contemplation to be formed under and subject to said agreements. We do not doubt it was first proposed and agreed to form a corporation in which Smith, Bierce and Minge should take and hold a controlling interest in the stock.

But it was not found possible to organize a corporation on that basis —one whose present and future success would be assured—and no

such corporation was ever organized. The leaders of the cotton trade in Shreveport absolutely refused to go into the movement on that basis. The enterprise was doomed to failure if this control by the New Orleans parties was insisted on. True, they might erect a compress— were well able to do so—but erecting a compress was *one* thing; controlling and securing cotton to feed it was *another* thing.

What these parties had in mind was not merely the erection of a compress, but, also, along with it, the practical control for the compress of the cotton received at Shreveport.

Columbus Bierce, when he was sent to Shreveport, had full power given him to inaugurate and carry through an enterprise such as that described. He was to organize a corporation which, through its members and connections, would control at least the greater part of the cotton converging at Shreveport for the compress which the corporation was to erect.

He and his bother composed the commercial firm doing business under the name of W. W. Bierce. His actions, then, in Shreveport were the actions of that firm.

To the firm of W. W. Bierce did Smith, Bierce and Minge entrust the execution of their plans. That firm acted at Shreveport mainly through its junior member. When he found himself beset by the difficulties hereinbefore mentioned, he asked for the coming of Smith and W. W. Bierce to Shreveport. Both agreed to come, but only W. W. Bierce did actually go. Instead of going, Smith wired that he would ratify and join in all that was done.

This telegram was addressed to W. W. Bierce. That was the firm's name and Smith knew it. The telegram must, therefore, be considered as having been directed to the firm—to both the Bierces, then in Shreveport. It plainly authorized them to go ahead and do that which might be found necessary to carry through the enterprise.

Two things found essential to this were: (1) to accord to all local feeders of the proposed compress the right to subscribe to the stock at par; (2) to give Hicks, Ardis and Taylor the option on 150 shares.

Both were done and both must be considered as coming within the intent, letter and spirit of Smith's telegram: "I will ratify and join in all you do."

After this plaintiffs cannot be heard to complain that the Bierces did not hold to the original agreement that the controlling interest

in the corporation should always remain in themselves, Bierce and Minge. Much less can they complain that Bierce did not offer his stock to them before parting with it to Hicks, Ardis and Taylor under the option they held.

Neither is the equity of the case with plaintiffs. What Bierce did in the way of granting the option and disposing of his stock enured to the benefit of plaintiffs, for it enabled the enterprise to be carried through, and its shares of stock advanced, according to the plaintiffs' own showing, in seven months, from par to a premium of one hundred per cent.

Whatever sacrifice was made, was made by Bierce. The option covered his stock only. He met it out of his stock. He let it go at par (one hundred per share) when it was worth two hundred.

Plaintiffs retained their large holdings, and as the result of the operations of the compress its first cotton season, realized a dividend of 20 per cent. on the amount they had invested.

Judgment affirmed.

MONROE, J., concurs in the decree.